**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0748n.06
Filed: October 19, 2007

Case No. 06-4090

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

MOUMINI KERE,                                  )
                                               )
    Petitioner,                                )
                                               )
                                               )          **ON APPEAL FROM THE**
    v.                                         )          **BOARD OF IMMIGRATION**
                                               )          **APPEALS**
ALBERTO GONZALES, Attorney General,            )
                                               )
    Respondent.                                )
                                               )
                                               )
_____      )

BEFORE: BATCHELDER and GILMAN, Circuit Judges; STAFFORD[*], District Judge.

    **ALICE M. BATCHELDER, Circuit Judge.** Moumini Kere seeks review of the Board of

Immigration Appeals's ("BIA") decision upholding the Immigration Judge's ("IJ") denial of Kere's

application for asylum, withholding of removal, and protection under the Convention Against

Torture ("CAT"). We deny the petition for review.

**I. BACKGROUND**

    Kere, a 57-year-old native of Burkina Faso, entered the United States on March 23, 2004,

using a non-immigrant visa, and filed an application for asylum, withholding of removal, and CAT

relief, asserting that his uncles, Ali Kere ("Ali) and Moris Kere ("Moris"), persecuted him on the

---

[*]The Honorable William H. Stafford, Jr., United States District Judge for the Northern District of Florida, sitting by designation.

basis of religion and the government of Burkina Faso was unwilling or unable to protect Kere. The former Immigration and Nationalization Service served Kere with a Notice to Appear because he overstayed his visa. Kere conceded removability.

## A. Asylum Application

In his application, Kere alleged that his uncles filed false embezzlement charges against him in Burkina Faso in 2003. In August of 2003, after returning from a trip to the United States, Kere learned that his uncles had filed criminal charges against him, alleging that he kept 4,900,000 francs CFA, which his uncles had given to him to deliver to another individual. Kere explained that he received the money, that he was to deliver the money to Eric Kere, and that he did, in fact, deliver the money to Eric Kere. He was imprisoned while a magistrate conducted an investigation into the allegations. On November 4, 2003, the magistrate declared Kere innocent of the embezzlement charges, and he was released on November 7, 2003.

Kere stated that in February 2004, his uncles visited Pastor Philippe Balima[1], Kere's friend, and told Pastor Balima that though the magistrate had released Kere, they were not going to leave him alone — they planned to attack Kere. Pastor Balima relayed the threat to Kere, who, on February 21, 2004, went to see the magistrate, relaying to him Kere's uncles' threat and seeking protection. The magistrate told him that the justice system could not ensure his safety and that if Ali and Moris attacked Kere, he could file a complaint with the police. In March 2004, Kere left Burkina Faso for the United States.

Kere explained that Ali and Moris, who are Muslim, hate him because he is Christian. While they have never said so directly, Kere stated that he knew from their actions that they have a problem

---

[1]The record refers to this individual as both Philippe Balima and Balima Philippe.

2

with his religion. Kere believed that his uncles brought the false embezzlement charges against him to hurt him because of his religion. Kere feared that Ali and Moris would attack and/or kill him if he were to return to Burkina Faso.

## B. Asylum Hearing

At the asylum hearing, Kere provided some additional information. He explained that he was raised by his uncles in a Muslim household, but he converted to Christianity at age 11. His uncles responded to his conversion by making him work on Sundays to prevent him from attending church services, making him sleep on the ground, and forcing him to go without food at times. Kere lived with his uncles for three more years and then moved in with his sister because his uncles mistreated him. Kere later became a pastor in the Assemblies of God church in Burkina Faso.

Kere's testimony about the embezzlement charges and his time in prison was consistent with his asylum application. He added that his uncles gave him the money on July 11, 2002, and he delivered the money to Eric Kere on July 12, 2002.

Kere also testified that after he left Burkina Faso, his son, Adriene, learned that Kere's uncles had tried to harm him. Kere's son wrote a letter in support of his father's asylum application, which stated that on February 1, 2005, Adriene and another individual went to the local jail, presumably to obtain a copy of Kere's release order. The magistrate[2] told Adriene that some time after Kere left Burkina Faso, Ali and Moris came to see him and asked for his help in preventing Kere from leaving the country. The magistrate said he could not help them. Adriene's letter then states that the gendarmes came to Kere's house on October 21, 2004, to investigate Kere's frequent trips to the

---

[2]Adriene refers to this individual as the "jail keeper." It appears, however, that the "jail keeper" is the same magistrate who previously acquitted Kere of the embezzlement charges.

United States, and to confiscate Kere's travel documents. The letter implicitly links the uncles' visit to the magistrate with the gendarmes' arrival at Kere's home.

Kere, however, explicitly linked his uncles' visit with the gendarmes' visit to his home. He asserted that the same magistrate who exonerated him on the embezzlement charges sent the gendarmes to his house on October 21 at the request of his uncles. Kere did not believe that his uncles had filed another complaint against him that might have prompted the magistrate to send the gendarmes. The IJ pointed out that if the magistrate did whatever Ali and Moris wanted, then the magistrate would have convicted Kere of stealing the money, but he did not.

> IJ: Well, if [the magistrate] did whatever [your uncles] wanted, you would have been convicted of stealing the money, but you weren't. So why would the magistrate want to harm you later on?
>
> Kere: It was because Ali and Moris have had plans to hurt me. That's why they were rushing like that.

Kere explained that his uncles wanted to prevent him from leaving the country so that they could attack him. And while his uncles were older men, he was afraid they would send someone out to attack him.

Additionally, Kere provided a letter authored by his wife, which detailed Kere's 2003 imprisonment pending the outcome of the embezzlement charges. The letter, however, failed to mention the October 2004 gendarmes' visit to her home.

The government questioned Kere about the timing of Pastor Balima's conversation with Ali and Moris. In his asylum application, Kere stated that Pastor Balima heard from Ali and Moris in February 2004 and then reported the conversation to Kere shortly thereafter. In a letter authored by Pastor Balima, he indicated that Ali and Moris visited him on December 5, 2003 — not in February

4

2004. Kere did not know why Pastor Balima waited almost two months to tell him about Ali's and Moris's threat.

The IJ denied relief because Kere failed to establish a nexus between the events he described and a basis for asylum relief. He concluded that while there is certainly family friction between Kere and his uncles, religion did not appear to be the cause of it. Additionally, he found that the Burkina legal system appeared to be functioning and that local authorities could and would intervene if Kere's uncles attempted to harm him. The BIA affirmed the IJ's decision without opinion. Kere timely petitioned this Court for review of the BIA's decision.

## II. ANALYSIS

Where the BIA affirms the IJ's decision without opinion, we review the IJ's decision as the final agency order. *Denko v. INS*, 351 F.3d 717, 730 (6th Cir. 2003). We will uphold the IJ's decision if it is "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). The petitioner, therefore, must show that the evidence "not only supports a contrary conclusion, but indeed *compels* it." *Klawitter v. INS,* 970 F.2d 149, 151-52 (6th Cir. 1992) (emphasis in original). Additionally, we may not reverse simply because we would have decided the case differently. *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998).

### A.    Adverse Credibility Determination

Kere argues that the IJ made several adverse credibility determinations, which are not supported by substantial evidence. The government contends, however, that the IJ made no adverse credibility determinations, and, instead "merely indicated doubts about parts of Kere's story that were based on information provided in the letter from Kere's son." In his written decision, the IJ

5

did not accept as true Kere's "claim that the gendarmes came to his house after he left Burkina Faso for the purpose of confiscating his passport and refusing to allow him to leave," stating that "[Kere's] testimony was not particularly convincing on this point." The IJ did, however, accept as true Kere's claim that he was prosecuted for embezzling his uncles' money.

It is unclear whether the IJ made an adverse credibility determination. It appears that the IJ did not necessarily find Kere incredible, but rather concluded that Kere's story, when considered in light of the totality of the evidence, simply did not make sense. Whether the IJ found Kere credible is immaterial to our analysis because Kere cannot demonstrate that the evidence compels a conclusion contrary to that of the IJ nor can he satisfy the statutory requirements for the relief he seeks.

## B. Denial of Asylum Claim

To be eligible for asylum, an applicant must first establish that he qualifies as a refugee. *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003). "Even if the alien qualifies as a refugee, the IJ may, in his discretion, deny asylum." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (citing 8 U.S.C. § 1158(a) & (b)). We review "the factual determination of whether a petitioner qualifies as a refugee under a 'substantial evidence' test." *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005) (citing *Yu*, 364 F.3d at 702).

A refugee is an alien who is unwilling to return to his country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An applicant has the burden of proving that he suffered past persecution or has a well-founded fear of future persecution. *Ramaj v. Gonzales*, 466 F.3d 520, 529 (6th Cir. 2006) (citation omitted).

6

Kere establishes past persecution if he shows that he has suffered persecution in Burkina Faso "'on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself . . . of the protection of, that country owing to such persecution.'" *Patel v. Gonzales*, 126 F. App'x 283, 291 n.3 (6th Cir. 2005) (quoting 8 C.F.R. § 208.13(b)(1)).

If Kere cannot establish past persecution, he may establish a "well-founded fear of future persecution" if (1) he has a fear of persecution in Burkina Faso on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility he would suffer such persecution if he were to return to Burkina Faso; and (3) he is unable or unwilling to return Burkina Faso because of such fear. *Mikhailevitch*, 146 F.3d at 389; *Patel*, 126 F. App'x at 291 n.3 (quoting 8 C.F.R. § 208.13(b)(2)(i)). Kere's fear of persecution must be both subjectively genuine and objectively reasonable. *Mikhailevitch*, 146 F.3d at 389. Kere must therefore "actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an objective situation under which his fear can be deemed reasonable." *Id.* (citation and internal punctuation omitted).

We have held that "'persecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Id.* at 390. Indeed, "'[p]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive.'" *Skirko v. Gonzales*, 153 F. App'x 958, 961 (6th Cir. 2005) (quoting *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004)). Finally, "a finding of persecution ordinarily requires a determination that government authorities, if they did not actually perpetrate or incite the

7

persecution, condoned it or at least demonstrated a complete helplessness to protect the victims."
*Galin v. INS*, 213 F.3d 955, 958 (7th Cir. 2000); *Skirko*, 153 F. App'x at 961 (same); *see also Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) ("persecution [i]s the infliction of harm or suffering by the government, or persons a government is unwilling or unable to control, to overcome a characteristic of the victim") (citation omitted).

The basis for Kere's claims is that his uncles persecuted him and will continue to persecute him for his conversion to Christianity and his continuing practice of the Christian faith. The IJ concluded, however, that Kere failed to establish that his uncles' actions were motivated by Kere's religion. That is, Kere did not demonstrate that he was persecuted or had a well-founded fear of persecution on account of religion. The IJ noted that Kere's uncles failed to prevent Kere from converting to Christianity and failed to prevent him from moving out of the house to live with his sister. There was no evidence that his uncles ever attempted to attack him.

The IJ concluded that the purpose of the gendarmes' October 2004 visit to Kere's home was not clear. Adriene's letter did not offer a clear explanation, and Kere provided no explanation beyond his own assumptions. The IJ surmised that in light of the apparently functioning legal system, it was quite possible that the uncles filed another complaint against Kere, and this is what brought the gendarmes to his home.

The IJ questioned the nature of the relationship between Kere and his uncles, especially because his uncles turned over a considerable sum of money to him and Kere agreed to deliver the money to another person.[3] The IJ concluded that "there is more [to the story of the embezzlement

---

[3]We also find it odd that Kere's uncles waited over a year to press charges. Kere stated that he delivered the money on July 12, 2002, and did not receive notice of the charges until August of 2003.

8

charges] than waiting 30 years to get revenge on [Kere] for becoming a Christian." The IJ concluded that "[w]hatever the cause of this family friction, it certainly does not appear to be primarily religion."

Kere challenges this conclusion. Beyond his own testimony that his uncles filed the false charges to punish him because of his religion, Kere points to letters submitted by friends and other pastors stating that after Kere's release from prison, they learned that Kere's uncles . . . "were after him because of his faith and his benefice [sic] of God's grace" and that "[c]ertain members of his family who are hostile to the Gospel as well as his ministry had tried by all means without touching him" to harm Kere, and so they set a trap for him with the false embezzlement charge instead. Kere also argues that he established past persecution because of the three years during which his uncles starved him, made him sleep on the floor, and prevented him from attending church services.[4] While there appears to be bad blood between Kere and his uncles, the evidence does not compel us to conclude that Kere's uncles persecuted him on the basis of his religion.

Moreover, Kere fails to demonstrate how the government authorities condoned his uncles' actions or were helpless to protect him. Kere has never claimed that Burkina officials perpetrated or incited persecution against him on the grounds of religion. When Kere was imprisoned, it was because of the embezzlement charges pending against him, not because he was a Christian minister. If the Burkina government had any desire to persecute Kere for his religious beliefs, surely the magistrate would have just let him sit in prison, rather than acquitting him. While the IJ regretted the false charges brought against Kere and the resulting imprisonment, he recognized that Kere's

---

[4]While certainly unpleasant, these actions, without more, do not rise to the level of persecution necessary to qualify for asylum. *See*, *e.g.*, *Mikhailevitch*, 146 F.3d at 390.

very acquittal evidenced that Burkina's legal system works.

Likewise, Burkina officials did not demonstrate "a complete helplessness to protect the victims." *Galin*, 213 F.3d at 958. When Kere approached the magistrate for protection, he received the same answer from him that he likely would have received from a local police officer in the United States: "until someone actually attempts to harm you, there is nothing the police can do." The magistrate instructed Kere to run away and contact the police if his uncles tried to attack him.

In fact, as the IJ noted, "[n]obody seemed to have taken the threat [made by his uncles to Pastor Balima] very seriously," including Pastor Balima. Pastor Balima's letter stated that Kere's uncles approached him on December 5, 2003, and conveyed their plan to attack Kere. Pastor Balima then waited two months to communicate the threat to Kere. Kere could not explain the delay.

The IJ likewise concluded that Kere failed to establish a well-founded fear of future persecution, noting that Kere's uncles "have been frustrated by their inability to act against [Kere] through the legal system." And while Kere may have a subjective fear of harm if he returns to Burkina Faso, he has failed to "present evidence establishing an objective situation under which his fear can be deemed reasonable." *Mikhailevitch*, 146 F.3d at 389.

Kere argues that *Matter of S-A-*, 22 I. & N. Dec. 1328 (BIA 2000), dictates a different conclusion. According to Kere, *Matter of S-A-* "stands for the proposition that a credible fear of persecution by a non-governmental actor on account of religious beliefs is a sufficient basis for asylum when the government is unable or unwilling to control the non-governmental actor to prevent the persecution." In *S-A-*, the petitioner was a 20 or 21 year old girl who had been terrorized by her father because she failed to conform to his orthodox Muslim beliefs. The petitioner did not seek help from the police because it would have been futile; according to the petitioner's aunt, under Muslim

10

law, particularly in Morocco, a father's power over his daughter is unfettered. Under these facts, the BIA concluded that the petitioner qualified for asylum because her father persecuted her on religious grounds and the Moroccan authorities would have been unwilling or unable to control her father's conduct. *S-A-*, 22 I. & N. at 1335.

Kere's case is distinguishable from the facts in *S-A-*. Beyond the sheer difference between what S-A- endured with her father and what Kere has endured with his uncles, Kere has provided no evidence that the Burkina government is unable or unwilling to control his uncles' conduct and protect Kere. In fact, the evidence points to the contrary — the local authorities not only respond to and investigate criminal complaints, but also acquit those innocent of the charges.

## C. Denial of Withholding of Removal Claim

"When an applicant 'fail[s] to meet the statutory eligibility requirements for asylum, the record necessarily supports the finding that [the applicant does] not meet the more stringent standard of a clear probability of persecution required for withholding of [removal].'" *Berri v. Gonzales*, 468 F.3d 390, 397 (6th Cir. 2006) (quoting *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005)). As the IJ concluded, because Kere fails to meet the requirements for asylum, he necessarily fails to meet the requirements for withholding of removal.

## D. Denial of CAT Claim

"To establish entitlement to such relief, [Kere] must prove 'that it is more likely than not that he . . . would be tortured if removed to [Burkina Faso].'" *Mapouya v. Gonzales*, 487 F.3d 396, 414 (6th Cir. 2007) (quoting *Singh v. Ashcroft*, 398 F.3d 396, 404 (6th Cir. 2005)).

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act

11

he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, *when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity*.

8 C.F.R. § 208.18(a)(1) (emphasis added). We agree with the IJ that "there is not [a] scintilla of evidence in this case that indicates that anybody wishes to torture [Kere], and certainly none that the government would acquiesce in or permit that to happen."

## III. CONCLUSION

For the foregoing reasons, we **DENY** Kere's petition to review the BIA's decision.