# Matter of A-B-, Respondent

*Decided by Acting Attorney General January 14, 2021*

U.S. Department of Justice
Office of the Attorney General

(1) *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), did not alter the existing standard for determining whether a government is "unwilling or unable" to prevent persecution by non-governmental actors. The "complete helplessness" language used in Matter of A-B- is consistent with the longstanding "unable or unwilling" standard, as the two are interchangeable formulations.

(2) The concept of "persecution" under the Immigration and Nationality Act, 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(a), (b)(i), is premised on a breach of a home country's duty to protect its citizens. In cases where an asylum applicant is the victim of violence or threats by non-governmental actors, and the applicant's home government has made efforts to prevent such violence or threats, failures in particular cases or high levels of crime do not establish a breach of the government's duty to protect its citizenry.

(3) The two-pronged test articulated by the Board of Immigration Appeals in *Matter of L-E-A-*, 27 I&N Dec. 40, 43–44 (BIA 2017), is the proper approach for determining whether a protected ground is "at least one central reason" for an asylum applicant's persecution, 8 U.S.C. § 1158(b)(1)(B)(i). Under this test, the protected ground: (1) must be a but-for cause of the wrongdoer's act; and (2) must play more than a minor role—in other words, it cannot be incidental or tangential to another reason for the act.

## BEFORE THE ACTING ATTORNEY GENERAL

Pursuant to 8 C.F.R. § 1003.1(h)(1)(i), I direct the Board of Immigration Appeals (the "Board") to refer to me its decision in this case. With the case thus referred, I hereby vacate the Board's June 30, 2020 decision and remand this case for review by a three-member panel consistent with this order.

In earlier proceedings in this case, Attorney General Jefferson B. Sessions, III, clarified important issues concerning the interpretation of the phrase "particular social group," and corrected an erroneous decision of the Board issued in 2014. *See Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018). Several courts of appeals have upheld that interpretation as reasonable and within the Attorney General's discretion. *See, e.g.*, *Del Carmen Amaya-De Sicaran v. Barr*, 979 F.3d 210, 217 (4th Cir. 2020) ("The Attorney General's ruling in *Matter of A-B-* is not arbitrary and capricious."); *Diaz-Reynoso v. Barr*, 968 F.3d 1070, 1078–87 (9th Cir. 2020) (rejecting an arbitrary-and-capricious challenge to *Matter of A-B-*); *Scarlett v. Barr*, 957 F.3d 316, 332–33 (2d Cir. 2020) (concluding that the Attorney General's

interpretation of "persecution" is reasonable and that the "complete helplessness to protect" formulation was not new but "is well grounded in circuit precedents"); *Amezcua-Preciado v. U.S. Att'y Gen.*, 943 F.3d 1337, 1344 (11th Cir. 2019) ("[W]e defer to the Attorney General's interpretation of the phrase 'particular social group' in *A-B-* because it is reasonable and consistent with both the BIA's and this Court's prior precedent."); *Gonzales-Veliz v. Barr*, 938 F.3d 219, 233 (5th Cir. 2019) ("reject[ing] . . . argument" that *Matter of A-B-* decision is arbitrary and capricious because "*A-B-* did not constitute a change in policy" and "assuming *arguendo* that *A-B-* can be read to constitute a change in policy, the Attorney General adequately acknowledged and explained the reasons for the change").  The opinion in *Matter of A-B-* sets forth the appropriate framework to govern the respondent's claim.

On remand from Attorney General Sessions's 2018 opinion and order, the immigration judge issued a new decision, which the Board affirmed. Although the Board sought to follow the Attorney General's opinion on remand, I am referring and reviewing this matter to provide additional guidance concerning three recurring issues in asylum cases involving applicants who claim persecution by non-governmental actors on account of the applicant's membership in a particular social group:  (1) whether Attorney General Sessions's 2018 opinion altered the existing standard for determining whether a government is "unwilling or unable" to prevent persecution by non-governmental actors; (2) whether a government that makes efforts to stop the harm in third-party persecution cases is "unable or unwilling" to prevent persecution; and (3) whether a protected ground must be more than a but-for cause in order to be at least "one central reason" for persecuting an asylum applicant.  With this matter referred to me, I issue this opinion to provide additional clarity on these three issues, and remand to the Board for further proceedings applying the principles outlined herein.

# I.

Attorney General Sessions's decision in *Matter of A-B-* reiterated the legal standard for determining when persecution committed by non-governmental actors may be attributed to the government.  As has long been the case, an asylum applicant must establish that the harm she suffered was "inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control." *Matter of Acosta*, 19 I&N Dec. 211, 222 (BIA 1985).  In discussing that standard, the Attorney General relied on several Federal court decisions that have addressed the "unable or unwilling" standard, including the Seventh Circuit's recognition that an applicant must show that the government

condoned the private actions "or at least demonstrated a complete helplessness to protect the victims." *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000). That discussion did not alter the "unable or unwilling" standard set forth in *Matter of Acosta*.

In the wake of the Attorney General's opinion, some applicants have argued that the decision's reliance on the "complete helplessness" language in *Galina* reflected a change in interpretation because that language was supposedly inconsistent with the "unable or unwilling" standard. I disagree. As the Second Circuit has recognized, that language is "not new," but "well grounded in circuit precedents"—decided before Attorney General Sessions issued the opinion in *Matter of A-B-*. *Scarlett*, 957 F.3d at 333. The "complete helplessness" language does not depart from the "unable or unwilling" standard; the two are interchangeable formulations. *See id.* at 332–33; *see also Gonzales-Veliz*, 938 F.3d at 233.

Before *Matter of A-B-*, several courts of appeals had used that language as a way of describing when a government was "unable or unwilling" to control persecution. *See Guillen-Hernandez v. Holder*, 592 F.3d 883, 886–87 (8th Cir. 2010) (quoting, with approval, "condoned it or at least demonstrated a complete helplessness to protect the victims" language from *Galina*, 213 F.3d at 958); *Kere v. Gonzales*, 252 F. App'x 708, 712 (6th Cir. 2007) (same); *Shehu v. Gonzales*, 443 F.3d 435, 437 (5th Cir. 2006) (same); *Hor v. Gonzales*, 421 F.3d 497, 501–02 (7th Cir. 2005) (same); *cf. Ortiz-Araniba v. Keisler*, 505 F.3d 39, 42 (1st Cir. 2007) ("An applicant must show the government's *acquiescence* in the persecutor's acts or its inability or unwillingness to investigate and punish those acts, and not just a general difficulty *preventing* the occurrence of particular future crimes" (first emphasis added)). The "two formulations accomplish the same purpose: to show that an alien's home government has more than difficulty . . . controlling private behavior." *Gonzales-Veliz*, 938 F.3d at 233 (internal quotation marks omitted).

Nevertheless, the D.C. Circuit recently interpreted *Matter of A-B-* as departing from the existing "unable or unwilling" standard and establishing a new, heightened one. *See Grace v. Barr*, 965 F.3d 883, 889–900 (D.C. Cir. 2020). In so doing, the D.C. Circuit did not discuss the several circuit court decisions to the contrary, but instead contended that "as a matter of plain language, the two formulations are hardly interchangeable" and that the *Matter of A-B-* standard "obviously" requires more culpability. *Id.* at 898–99. Along with the Second and Fifth Circuits, I disagree. *See supra* at 199 (discussing *Gonzales-Veliz*, 938 F.3d at 233, and *Scarlett*, 957 F.3d at 333). *Matter of A-B-* did not alter the longstanding "unable or unwilling" standard or implement a new, more stringent test for determining when persecution by third parties may be attributed to the government. A

government that is unwilling to control or protect against private harm can be said to "condone" it, in the ordinary sense of that word. *See, e.g.*, *Webster's Third New International Dictionary* 473 (1993) (condone means "to permit the continuance of"). And the "completely helpless" formulation identifies "as persecutors governments that are actually unable to protect persons against private violence," while ensuring "that a government is not charged with persecution for failing to provide a particular standard of protection, or for lapses in protection." *Scarlett*, 957 F.3d at 333. This is consistent with existing law, since "able" to protect has always been applied as a matter of degree, rather than as a guarantee of absolute protection. *See Saldana v. Lynch*, 820 F.3d 970, 977 (8th Cir. 2016) ("[A] government that is 'unable' to control criminal activity cannot mean anything and everything short of a crime-free society; the standard is more akin to a government that has demonstrated 'complete helplessness' to protect victims of private violence."); *Galina*, 213 F.3d at 958 ("since a finding of persecution ordinarily requires a determination that government authorities, if they did not actually perpetrate or incite the persecution, condoned it or at least demonstrates a complete helplessness to protect the victims"). The reference in *Matter of A-B-* to this well-established formulation thus paraphrased existing law concerning when, under the Immigration and Nationality Act ("INA"), private-party violence may be attributed to a foreign government as its own "persecution" because of an unwillingness or inability to control it.[1]

## II.

No matter whether *Matter of A-B-* is viewed as changing the existing standard for persecution, I conclude, in accordance with my authority to interpret the INA, *see* 8 U.S.C. § 1103(a)(1), that *Matter of A-B-'s* formulation appropriately clarifies the requisite governmental role in relation to persecution by private actors for purposes of establishing refugee status.[2]

---

[1] Because the complete-helplessness standard and unwilling-or-unable formulations are interchangeable expressions of the same substantive standard, the former is not a change in policy that requires a reasoned explanation. *But see Grace*, 965 F.3d at 899–900 (holding that use of "complete helplessness" language constituted an unexplained change in policy).

[2] The Departments of Justice and Homeland Security recently promulgated regulations to codify the definition of the term "persecution" consistent with case law:

> For purposes of adjudicating an application for asylum under section 208 of the Act or an application for withholding of removal under section 241(b)(3) of the Act, persecution requires an intent to target a belief or characteristic, a severe level of

In cases where the applicant's home government made efforts to prevent the claimed persecution, an increasingly frequent question is how effective a government's protection from private violence must be to preclude a finding of persecution. Adjudicators may benefit from guidance on the reasons for the unwilling/unable to protect standard and guideposts for how to apply it in particular cases. *See Urbina-Dore v. Holder*, 735 F.3d 952, 954 (7th Cir. 2013) ("The Board has used the 'unwilling or unable to control' formula since 1964 yet has never attempted to quantify just how far a nation may depart from perfect law enforcement without being deemed complicit in private crimes."). For the reasons explained below, the "complete helplessness" formulation reflects an appropriate way to understand the unwilling and unable standard—one that is consistent with the text of the INA and the Attorney General's discretion under the Act. *Contra Grace*, 965 F.3d at 897–99.

## A.

One threshold question is how best to interpret "persecution" in this context. The reason for requiring governmental involvement in persecution is the longstanding premise that persecution is defined by a breach of the home country's duty to protect its citizens. *See Rodas-Mendoza v. INS*, 246 F.3d 1237, 1240 (9th Cir. 2001) ("[V]iolence 'completely untethered to a governmental system does not afford a basis for asylum.'" (internal citation

---

harm, and the infliction of a severe level of harm by the government of a country or by persons or an organization that the government was unable or unwilling to control. For purposes of evaluating the severity of the level of harm, persecution is an extreme concept involving a severe level of harm that includes actions so severe that they constitute an exigent threat. Persecution does not encompass the generalized harm that arises out of civil, criminal, or military strife in a country, nor does it encompass all treatment that the United States regards as unfair, offensive, unjust, or even unlawful or unconstitutional. It does not include intermittent harassment, including brief detentions; threats with no actual effort to carry out the threats, except that particularized threats of a severe harm of immediate and menacing nature made by an identified entity may constitute persecution; or, non-severe economic harm or property damage, though this list is nonexhaustive. The existence of government laws or policies that are unenforced or infrequently enforced do not, by themselves, constitute persecution, unless there is credible evidence that those laws or policies have been or would be applied to an applicant personally.

*See* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80,274, 80,395 (Dec. 11, 2020) (to be codified at 8 C.F.R. § 1208.1(e)); *see also id.* at 80,386 (substantially similar language to be codified at 8 C.F.R. § 208.1(e)). Although this definition is not controlling on this particular case, it is consistent with the parameters outlined in this case.

omitted)); *see also* 8 C.F.R. §§ 1208.13(a), 1208.16(b).  As the Board noted in one of its foundational decisions:  "Traditionally, a refugee has been an individual in whose case the bonds of trust, loyalty, protection, and assistance existing between a citizen and his country have been broken and have been replaced by the relation of an oppressor to a victim."  *Matter of Acosta*, 19 I&N Dec. at 235 (citing 1 Atle Grahl-Madsen, *The Status of Refugees in International Law* 97, 100 (1966)); *see also Harutyunyan v. Gonzales*, 421 F.3d 64, 68 (1st Cir. 2005) ("[P]ersecution always implies some connection to government action or inaction.").

While every civilized state seeks to protect its citizens from harm, no government can provide "a crime-free society."  *Saldana*, 820 F.3d at 977.  The level of inaction or ineffectiveness required to rise to the level of persecution should, accordingly, be high.  The Refugee Act should not be read to guarantee freedom from crime, or even to guarantee the same crime-fighting resources that are available in more wealthy countries.  *See Scarlett*, 957 F.3d at 333 ("The 'complete helplessness' formulation from [*Matter of A-B-*] thus ensures that a government is not charged with persecution for failing to provide a particular standard of protection, or for lapses in protection.  At the same time, it serves to identify as persecutors governments that are actually unable to protect persons against private violence . . . .").  The word "persecution" therefore should be read to require that the government in the home country has fallen so far short of adequate protection as to have breached its basic duty to protect its citizens, or else to have actively harmed them or condoned such harm.  Where the government is actively engaged in protecting its citizens, failures in particular cases or high levels of crime do not establish a breach of the government's duty to protect its citizenry.  *See*, *e.g.*, *Velasquez-Gaspar v. Barr*, 976 F.3d 1062, 1064–65 (9th Cir. 2020) (although Guatemala "has a long way to go in addressing domestic violence," substantial evidence, including Guatemala's efforts to curb violence against women, supported the determination that the Guatemalan Government could have protected the alien against her abuser); *Ritonga v. Holder*, 633 F.3d 971, 977–78 (10th Cir. 2011) (despite voluminous documentation of violence against Christians in various parts of Indonesia and some evidence of government tolerance, concluding that record as a whole does not show government unable or unwilling to combat such crimes); *Burbiene v. Holder*, 568 F.3d 251, 255–56 (1st Cir. 2009) (Lithuanian Government was not unwilling or unable to combat human trafficking, where it was making efforts to fight crime but had not been able to eliminate it, because these efforts were like any other government that experiences successes and setbacks in fighting crime).

This understanding of the "unable or unwilling" standard makes clear that the government must have some role in or responsibility for the

"persecution."[3]　Furthermore, this interpretation provides reasonable and appropriate constraints on the definition of "persecution" in this context. I find no indication in the text or history of the INA that Congress intended the United States to be the insurer of all high-crime jurisdictions, taking in large numbers of victims of private criminal activity because their home countries failed to provide the level of police protection found elsewhere. *Cf. Velasquez v. Sessions*, 866 F.3d 188, 199 (4th Cir. 2017) (Wilkinson, J., concurring) ("The asylum statute is not a general hardship statute."); *Barajas-Romero v. Lynch*, 846 F.3d 351, 357 (9th Cir. 2017) ("For purposes of asylum or withholding of removal, it is not enough that a person comes from a wretched place, where life will most probably be far worse than if he remains in the United States."). Asylum law protects persons from severe harm inflicted at the hands of their government on the basis of a protected characteristic; it does not entitle everyone in the world to the same level of safety that we enjoy in the United States.

I also stress that "unable" must mean more than the failure to prevent or solve a particular crime. The phrase "unwilling or unable to protect" has long excluded from the definition of "persecution" instances where a government has taken efforts to punish wrongdoers who have already committed a crime, even though the crime's existence shows the government was not able to prevent the harm in the first place. *See, e.g.*, *K.H. v. Barr*, 920 F.3d 470, 475–78 (6th Cir. 2019) (Guatemalan Government was not unwilling or unable to control private wrongdoers where after a child was raped, the government mobilized to capture criminals and punish them). Crime occurs in all societies, and governments discharge their duty to protect their citizens by their efforts to detect and punish crime, as well as by their efforts to prevent it. One should not focus narrowly on whether government efforts to protect the applicant were effective in her specific case, or focus on a few cases where perpetrators went unpunished. *See Al Khalili v. Holder*,

---

[3]　As courts of appeals have recognized, a government that is unaware of persecution generally cannot be said to have some role or responsibility for it. Thus, an alien alleging persecution by private actors may have difficulty establishing persecution on account of a protected ground when he or she has failed to apprise authorities of the persecution. *See, e.g.*, *Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1345 (11th Cir. 2007) ("Although the failure to report persecution to local government authorities generally is fatal to an asylum claim . . . it [may] be excused where the [alien] convincingly demonstrates that those authorities would have been unable or unwilling to protect her, and for that reason she could not rely on them." (internal citation omitted)).　An alien's failure to apprise authorities of private-actor persecution may be excused in narrow circumstances, *see id.*, but it ordinarily will be difficult for an alien to establish, counter-factually, that authorities would have been unwilling or unable to help him or her individually if they had been aware of the persecution.　As necessary or appropriate, the Board may address this point further upon remand.

557 F.3d 429, 436 (6th Cir. 2009) (despite fact that some perpetrators got light sentences, Jordanian government was not unwilling or unable to protect male applicant from honor killings); *cf. Juan Antonio v. Barr*, 959 F.3d 778, 799–800 (6th Cir. 2020) (Boggs, J., concurring) ("It is an unfortunate truth that even in this country there are many occasions when our local governments have done no more than Guatemala did here, with far more tragic outcomes . . . .  It seems a bit of a stretch to charge Guatemala with unwillingness to enforce its laws simply because it is not always successful.  If that is the standard, the number of countries from which persecution could be claimed under this heading would undoubtedly multiply greatly.").  Absolute prevention of private criminal acts is a standard that any country—including our own—would fail.  According to the Department of Justice's Bureau of Justice Statistics, in 2019 there were over 2 million serious violent crimes in the United States and over 1 million incidents of domestic violence.  *See* Bureau of Justice Statistics, U.S. Dep't of Justice, NCJ 255113, *Criminal Victimization, 2019*, at 3 tbl.1, 5 tbl.3 (Sept. 2020).  And according to another report, even when domestic violence incidents are reported, a criminal complaint is filed only 48% of the time, and the offender was arrested or charged only 39% of the time.  *See* Bureau of Justice Statistics, U.S. Dep't of Justice, NCJ 250231, *Police Response to Domestic Violence, 2006–2015*, at 1 (May 2017).

In even the most well-functioning, well-funded of criminal justice systems, innocent people will be victimized by crime, the police will at times prove ineffective, and the guilty may go unpunished.  *Cf. Cece v. Holder*, 733 F.3d 662, 679 (7th Cir. 2013) (Easterbrook, J. dissenting) ("Crime may be rampant in Albania, but it is common in the United States too.  People are forced into prostitution in Chicago.  Must Canada grant asylum to young women who fear prostitution in the United States, or who dread the risk of violence in or near public-housing projects?" (internal citation omitted)).  But the inability to eradicate private crime does not establish in any measure that a government is affirmatively persecuting its own citizens.  *See, e.g.*, *Urbina-Dore*, 735 F.3d at 954 ("Many places in the United States endure high levels of violence without any suggestion that the police and judiciary have abetted criminals in 'persecution' of persons whose property is stolen or whose lives are threatened."); *Nahrvani v. Gonzales*, 399 F.3d 1148, 1154 (9th Cir. 2005) (where German police took reports, investigated, and did not solve crimes, government was not unwilling or unable to control alleged persecutors).  There must be far more before a decision maker may reasonably conclude that a foreign country is "unable or unwilling" to prevent persecution.

**B.**

An additional factor to consider in determining whether a country is "unable or unwilling" is the possibility of internal relocation. *See* 8 C.F.R. § 208.13(b)(2)(ii), (b)(3). Persecution requires that "the bonds of trust, loyalty, protection, and assistance existing between a citizen and his country have been broken," *Matter of Acosta*, 19 I&N Dec. at 235, such that asylum in a foreign country is warranted. If an alien may reasonably relocate within his home country to avoid persecution, then that may show that the failure to prevent private violence is localized and the foreign country is not itself "unwilling or unable" to prevent persecution.

Although evidence of localized police apathy or incompetence may indicate a government's unwillingness or inability to prevent persecution, in many cases the localized apathy is just that—localized. *See, e.g.*, *Vahora v. Holder*, 707 F.3d 904, 908–09 (7th Cir. 2013) (where local police and political leaders participated in communal violence, but country reports showed national government was pursuing efforts to bring them to justice, government was not unwilling or unable to control); *Harutyunyan*, 421 F.3d at 69 ("[A] finding that violence is localized supports a determination that the violence does not constitute persecution."). The applicant may receive effective government protection by relocating within their home country, where the attitudes of local authorities may be different.

As Attorney General Sessions noted,

> An immigration judge, "in the exercise of his or her discretion, shall deny the asylum application of an alien found to be a refugee on the basis of past persecution" if it is "found by a preponderance of the evidence" that "the applicant could avoid future persecution by relocating to another part of the applicant's country of nationality, . . . and under all the circumstances, it would be reasonable to expect the applicant to do so."

*Matter of A-B-,* 27 I&N Dec. at 344–45 (quoting 8 C.F.R. § 1208.13(b)(1)(i)(B)). This requirement reflects the Board's longstanding view that the asylum "analysis must still consider whether government protection is available, internal relocation is possible, and persecution extends countrywide." *Matter of M-E-V-G-*, 26 I&N Dec. 227, 243 (BIA 2014).

**III.**

To establish eligibility for asylum, an applicant must show a nexus between past or feared future persecution and one of the protected grounds (race, religion, nationality, membership in a particular social group, or

political opinion). *See* 8 U.S.C. § 1158(b)(1)(A); *see also* 8 U.S.C. § 1101(a)(42)(A) (defining a refugee as one who has suffered or has a well-founded fear of persecution "on account of" a protected ground). This requires proof that the persecutor knew or believed that the applicant had one of these protected characteristics, and that knowledge or belief motivated the persecutors' harmful actions against the applicant. *INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992). Concerned with how this standard was being applied in cases in which the alleged persecutor had more than one plausible motive for harming the victim, Congress enacted the REAL ID Act of 2005, Pub. L. No. 109–13, 119 Stat. 302, "to create a uniform standard" for assessing motivation. *Matter of N-M-*, 25 I&N Dec. 526, 531 (BIA 2011) (citing H.R. Rep. No. 109-72, at 163 (2005) (Conf. Rep.)). An accompanying congressional committee report specifically noted that Ninth Circuit cases requiring only that the applicant's persecutor was motivated "at least in part" by the protected ground had "'undermined a proper analysis of mixed motive cases.'" *Id.* (quoting H.R. Rep. No. 109-72, at 163). To address these concerns, the REAL ID Act clarified that the alien's protected characteristic must be "at least one *central* reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added).

In one of the first major cases to reach a court of appeals after the REAL ID Act, the Ninth Circuit held that a central reason is "one that is 'primary,' 'essential,' or 'principal,'" and that "represents more than a mere 'part' of a persecutor's motivation," *Parussimova v. Mukasey*, 555 F.3d 734, 740 (9th Cir. 2009) (considering the ordinary and natural meaning of "central"), and observed that "the REAL ID Act places a more onerous burden on the asylum applicant" than the one that the Ninth Circuit had previously applied, *id.* at 740. Because "[a] 'central' reason is a reason of primary importance to the persecutors, one that is essential to their decision to act," *id.* at 741, the Ninth Circuit agreed with the Board that "the protected ground cannot play a minor role in the alien's past mistreatment or fears of future mistreatment," *id.* (quoting *Matter of J-B-N- & S-M-*, 24 I&N Dec. 208, 214 (BIA 2007)). In *Matter of N-M-*, the Board adopted this standard, holding that: "In cases arising under the REAL ID Act . . . an alien must demonstrate that the persecutor would not have harmed the applicant if the protected trait did not exist." 25 I&N Dec. at 531 (citing *Parussimova*, 555 F.3d at 741).

In subsequent cases, the Board refined these observations into a two-pronged test for determining whether a protected ground is "one central reason" for an asylum applicant's persecution. To establish the necessary nexus, the protected ground: (1) must be a but-for cause of the wrongdoer's act; and (2) must play more than a minor role—in other words, it cannot be incidental or tangential to another reason for the act. *See Matter of L-E-A-*, 27 I&N Dec. 40, 43–44 (BIA 2017) ("*Matter of L-E-A- I*"), *aff'd in relevant*

*part*, 27 I&N Dec. 581, 584–85 (A.G. 2019) ("*Matter of L-E-A- II*"). It is not sufficient for the applicant to establish simply that a particular social group exists, and that the members of that group experienced harm. *Matter of L-E-A- I*, 27 I&N Dec. at 45.

In *Matter of L-E-A- I*, the Board explained that if the wrongdoer has no animus against the protected characteristic, and the only significance of the protected characteristic to him is as a means to an end, then the protected characteristic is only "incidental" to the wrongdoer's motivation. 27 I&N Dec. at 45–46. In that case, a cartel targeted the applicant because he was a member of his family, but only because it wanted to use his father's store to sell drugs. The applicant sought asylum, relying on a particular social group of his father's immediate family. But the evidence did not show that the cartel had "any animus against the family or the [applicant] based on their biological ties, historical status, or other features unique to that family unit." *Id.* at 46–47. The Board held that "the fact that a persecutor targets a family member simply as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground." *Id.* at 45; *see also Gonzalez-Posadas v. Att'y Gen. U.S.*, 781 F.3d 677, 686 (3d Cir. 2015) (holding that persecutors' use of homophobic slurs against an applicant who claimed asylum on the basis of his sexual orientation did not satisfy the nexus requirement because "the abusive language was a means to an end—namely cowing [the applicant] into paying them off or joining their gang"). In other words, the applicant's status as a member of his father's immediate family may have been a but-for cause of the harm he suffered, but it was only incidental to the persecutor's motivation, not a "central" reason for it.

In mixed-motive cases, the Fourth Circuit (where this case originated) has applied a broader standard than the Board or its sister circuits. *See Matter of L-E-A- I*, 27 I&N Dec. at 46 n.3 (recognizing a potential divergence between the Fourth Circuit's and the Board's nexus jurisprudence). The Fourth Circuit asks whether the protected characteristic, even if intertwined with another motive, is "why [the applicant], and not another person, was threatened" or harmed. *Alvarez Lagos v. Barr*, 927 F.3d 236, 250 (4th Cir. 2019). Even if the protected characteristic is only used opportunistically, the Fourth Circuit appears to believe that a causal relation is sufficient to establish nexus as a matter of law. *Id.* at 250–51. As summarized recently by the Fourth Circuit:

> A sufficient nexus exists where membership in a particular social group is why the applicant, rather than some other person, is targeted for persecution. This principle applies whether the persecution is motivated by freestanding animus against the group, or by some other motive like gang recruitment, extortion, or revenge. Rather than focusing on the persecutor's reasons for targeting the *group*, we ask whether

membership in the group explains the decision to target the *applicant* instead of someone else.

*Perez-Morales v. Barr*, 781 F. App'x 192, 196 (4th Cir. 2019) (internal citations omitted).

The Fourth Circuit's recent interpretation of the INA's nexus requirement significantly departs from the standard articulated by the Board, and earlier precedent of the Fourth Circuit, and it would essentially eliminate the second prong of the Board's test. Under the Fourth Circuit's recent precedents, it appears to be sufficient for the applicant's protected status to be a but-for cause of the harm she suffers, regardless of whether that status is only incidental or tangential to another reason. For instance, in *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 244 (4th Cir. 2017), the Fourth Circuit reviewed a Board decision ordering an asylum applicant removed to El Salvador because she failed to show persecution on account of her family membership. Although the applicant testified that a Salvadoran gang had threatened and harassed her because of her membership in the Policiano family, the Board held that she failed to establish that the gang's threats were motivated, as one central reason, by her family ties. *Id.* at 246. Relying on the extortion notes that the gang sent to the applicant which indicated no evidence of animus against the applicant's family, the Board affirmed the immigration judge's finding that the gang was motivated by its general desire to terrorize society as a means of obtaining greater influence and power in the region. *Id.* at 248.

The Fourth Circuit reversed, beginning its nexus analysis with the mistaken premise that the Board had required that the applicant prove that "the gang's threats were 'exclusively' motivated by her family ties." *Id.* at 250. But this misconstrues the Board's nexus analysis. In its first major case considering the new asylum provisions in the REAL ID Act, the Board expressly concluded that "aliens whose persecutors were motivated *by more than one reason* continue to be protected under section 208 of the [INA] if they can show a nexus to a protected ground." *Matter of J-B-N- & S-M-*, 24 I&N Dec. at 213 (emphasis added). Nevertheless, the Fourth Circuit concluded that the Board erred because the applicant's membership in the Policiano family was a but-for cause of the harm she suffered; her "relationship to her father is why she, rather than some other person, was targeted for extortion." *Zavaleta-Policiano*, 873 F.3d at 250. The Fourth Circuit opinion thus appears to read the "at least one central reason" requirement to allow any but-for cause of harm to qualify as a central reason, regardless of whether that cause is only incidental or tangential to the wrongdoer's actual motivation. *But see Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4th Cir. 2009) (citing with approval Board precedent that "the REAL ID Act requires a protected ground to be *the* central reason or even a

210

dominant central reason for persecution, only that it cannot be an 'incidental, tangential, superficial, or subordinate' reason" (quoting *Matter of J-B-N- & S-M-*, 24 I&N at 214)).

I believe that the Fourth Circuit's recent interpretation of "one central reason" is not the best reading of the statutory language. Before the REAL ID Act, the INA already required that an alien establish that she satisfies the definition of a refugee, which requires persecution to be "on account of" the alien's protected status, 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A) (2005). As the Supreme Court recognized, statutory phrases such as "on account of," "because of," or "results from" all require but-for causation. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351–57 (2013) ("because" in Title VII of Civil Rights Act of 1964 requires plaintiffs to establish retaliation claims according to traditional principles of but-for causation); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (treating "because of" and "on account of" as equivalents, which entail but-for causation); *see also Burrage v. United States*, 571 U.S. 204, 212 (2014) ("Where there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality."). But-for causation is "the minimum requirement for a finding of causation." *Burrage*, 571 U.S. at 211. Thus, in the asylum context, the phrase "on account of" in the INA's definition of refugee may require that an applicant's protected status be a but-for cause of the applicant's persecution.

In the REAL ID Act, however, Congress layered on the additional requirement that an alien show that her protected status is "at least one central reason for persecuting the applicant." *See* 8 U.S.C. § 1158(b)(1)(B)(i). I believe that the best way to read this new requirement is that it requires more than but-for causation. To conclude otherwise, as the Fourth Circuit appears to do, would render the REAL ID Act's additional language mere surplusage. This is why the Board established a two-pronged test for proving nexus: the applicant's protected status must be *both* a but-for cause of her persecution *and* it must play more than a minor role that is neither incidental nor tangential to another reason for the harm or a means to a non-protected end. *See Matter of L-E-A- I*, 27 I&N Dec. at 43–44.

My conclusion that this reflects the better interpretation of the REAL ID's Act's "one central reason" requirement is further supported by the fact that the Board's test generally accords with a much greater swath of Federal court of appeals precedent than does the Fourth Circuit's approach. Other circuits have taken an approach similar to that of the Board, declining to find the necessary nexus when the alien's protected status—despite being a but-for

cause of the harm she suffered or fears—is only incidental to the wrongdoer's primary motivation.[4]

For these reasons, I conclude that the two-pronged test articulated by the Board in *Matter of L-E-A- I* is the proper approach for determining whether an asylum applicant has satisfied the nexus requirement in mixed-motive cases.

---

[4]  *See, e.g.*, *Reyes Almendarez v. Barr*, 817 F. App'x 35, 40 (6th Cir. 2020) ("Petitioners fail to show that the familial connection was at least one central reason for persecuting them, as opposed to, for instance, the gang's actions being a result of its general, criminal goal of enacting revenge on one who reports gang activities to the police. Put differently, harming Lidia's family was a *means* to achieve some other goal, not an *end* in itself." (internal quotation marks and citation omitted)); *Zapata Suquilanda v. Att'y Gen. U.S.*, 816 F. App'x 723, 725 (3d Cir. 2020) (citing *Matter of L-E-A- II* and reasoning that family membership was not a central reason, where it was just a means to an end of gaining land); *Contreras-Mejia v. Barr*, 815 F. App'x 694, 699 (4th Cir. 2020) (per curiam) ("[T]he record illustrates that Contreras's past persecution was linked only to his refusal to join the MS-13 gang, and not to his family membership."); *Ferreyra v. Barr*, 962 F.3d 331, 338 (7th Cir. 2020) ("The evidence must show that family membership was the motivation for the persecution . . . . The fact that [Ferreyra's] membership in the family may have made him more accessible is not sufficient."); *Gonzales-Veliz*, 938 F.3d at 225, 234 (substantial evidence supported finding that applicant's ex-partner harmed her as retribution for suing him for child support, not because of her status as a Honduran women who was unable to leave a relationship); *Rivas v. Sessions*, 899 F.3d 537, 542 (8th Cir. 2018) ("The evidence established only that gang members persecuted Rivas because she was a witness to her brother's shooting, was one of the last people to see him before he went into hiding, and had information concerning his whereabouts. The record does not compel a conclusion that family relationship—independent of these other factors—was a central reason for persecution."); *Ruiz-Escobar v. Sessions*, 881 F.3d 252, 260 (1st Cir. 2018) (affirming holding of no nexus between family and persecution where the evidence showed that "Los Cachiros sought to obtain the Ruiz family's land, not that the narcotraffickers had a continuing interest in harming the Ruiz family once they gained possession of that land."); *Reyes v. Sessions*, 750 F. App'x 656, 660–61 (10th Cir. 2018) (even assuming particular social group of "females in El Salvador" was cognizable, gender was "tangential and even subordinate" to the more important reason for the abuse—the applicant's vulnerability); *Cruz v. U.S. Att'y Gen.*, 746 F. App'x 869, 872 (11th Cir. 2018) (per curiam) ("The fact that a persecutor targets a family member as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground."). *But see Gonzalez Ruano v. Barr*, 922 F.3d 346, 356 (7th Cir. 2019) (husband's family relationship to his wife was "the reason he, and not someone else, was targeted" (citing *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 950 (4th Cir. 2015))); *Ayala v. Sessions*, 855 F.3d 1012, 1020 (9th Cir. 2017) (extortion could constitute persecution on account of a family, where criminals selected the applicant for extortion because her family owned hotels); *Paloka v. Holder*, 762 F.3d 191, 198 (2d Cir. 2014) ("[B]eing a victim of a crime or even being a likely target for criminal opportunistic behavior does not necessarily preclude the existence of a valid asylum claim if the claimant would likely be targeted because of her membership in a sufficiently defined social group.").

## IV.

As explained above, I understand that existing case law in certain circuits may conflict with my conclusions that (1) *Matter of A-B-* reiterated and did not change the legal standard for determining when "persecution" by third parties may be attributed to the government; and (2) more than but-for causation is required to show that the alien's protected characteristic is "at least one central reason" for the persecution. In my view, however, those decisions were made without the benefit of clear and controlling interpretations of the statutory "unable or unwilling," "persecution," and "one central reason" requirements. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."). The statutory language of the INA and the REAL ID Act do not unambiguously resolve these issues. *See, e.g.*, *Grace*, 965 F.3d at 897 ("persecution" is ambiguous); *Sanchez v. U.S. Att'y Gen.*, 523 F. App'x 682, 684 (11th Cir. 2013) (per curiam) (phrase "one central reason" is ambiguous). The Attorney General "has primary responsibility for construing ambiguous provisions in immigration laws" and his "reasonable construction" of such ambiguous terms "is entitled to deference" under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). *Matter of A-B-*, 27 I&N Dec. at 326. With this in mind, I have exercised my discretion in choosing what I view as the best interpretation of the statute.

I remand this matter to the Board to issue a new opinion consistent with this opinion.